**Robert CUCCIOLI, Plaintiff,**

v.

**JEKYLL & HYDE NEUE METROPOL BREMEN THEATER PRODUKTION GMBH & CO., Defendant.**

**No. 00 Civ.1995(LAK).**

United States District Court, S.D. New York.

July 2, 2001.

Lisa M. Fantino, White Plains, NY, for Plaintiff.

Ronald P. Mysliwiec, New York City, for Defendant.

## MEMORANDUM OPINION (Corrected)

KAPLAN, District Judge.

Plaintiff, the star of the New York production of the musical, *Jekyll & Hyde*, here sues the producer of the German production for violation of Sections 50 and 51 of the New York Civil Rights Law. He contends that the German producer is using his likeness on merchandise and other materials in violation of the statute. The matter is before the Court on cross motions for summary judgment. The two main issues at this stage are whether there is any genuine issue of material fact regarding the exercise of personal jurisdiction over the defendant and whether the New York Civil Rights Law has extraterritorial effect.

I

The following facts are undisputed.[1] The plaintiff appeared in the eponymous role(s) in the Houston, off-Broadway, and Broadway productions of the musical *Jekyll & Hyde* from 1995 to 1999. The defendant, a German company, is in the business of theatrical productions and related endeavors. Its principal place of business is Bremen, Germany. Following negotiations in New York, Music Theatre International ("MTI"), Wildhorn Productions, Inc. ("WPI"), and Stage and Screen Music, Inc. ("SSMI"), licensed the defendant to produce *Jekyll & Hyde* in Germany, Austria, and Switzerland.[2]

This dispute dates back at least to 1998. On March 20, 1998, the defendant received a fax from MTI stating that "[p]er my voice mail message, PACE[3] has signed off on the use of the title treatment for *Jekyll & Hyde*."[4] The parties disagree concerning whether this approved defendant's title treatment only or the logo as a whole.[5] In any case, defendant's musical and art director wrote to the plaintiff in August 1998, enclosing samples of merchandise and stating that "our logo is a combination of the tour logo (red and black) and the Broadway logo. If you have a closer look at it, you will see that the face is yours! So I thought it a nice idea to get you some samples of it . . ." So much for good intentions.

During the following month, plaintiff's management firm demanded that defendant cease and desist from this use of plaintiff's image. The parties agree that the defendant never obtained written consent from the plaintiff to use his likeness.

The German production of *Jekyll & Hyde* premiered on February 19, 1999, a month after plaintiff's final appearance in

---

1. *See* Joint Pretrial Order ("PTO"); *see also* Am. Cpt.; Second Am. Answer.

2. PTO, at 2. The initial agreement is dated March 7, 1996. A supplemental production agreement is dated December 12, 1997. PX O.

3. Pace Theatricals is one of various affiliates or successors that produced *Jekyll & Hyde* in New York. PTO, at 2.

4. *See* PX F.

5. *See* PTO, at 4, 6.

the Broadway production.[6] In March 1999, defendant signed an agreement with Polydor Records, GmbH, to release a compact disc of its German-language cast recording of *Jekyll & Hyde*. The logo containing plaintiff's image appears on the CD itself, on the back of the package liner, and on pages of the liner that offer other merchandise featuring the disputed image. The parties agree that this CD made its way to New York consumers through at least one sale off defendant's web site, <www.jekyll-hyde.de>, and several sales through local record stores,[7] although there is no evidence that defendant was responsible for the CD reaching the local stores.

Plaintiff brought this action in March 2000, premising subject matter jurisdiction on diversity or, more properly, alienage. The amended complaint alleges use of the plaintiff's image in violation of New York Civil Rights Law Sections 50 and 51 and requests compensatory and exemplary damages as well as injunctive relief. Defendant has interposed five affirmative defenses: lack of personal jurisdiction, the statute of limitations, lack of subject matter jurisdiction based on the alleged insufficiency of the minimum amount in controversy, failure to state a claim upon which relief may be granted, and *forum non conveniens*.[8]

On September 21, 2000, following discovery, plaintiff moved for summary judgment and to dismiss defendant's affirmative defenses. Defendant cross-moved for summary judgment dismissing the complaint on the ground that it fails to state a claim upon which relief may be granted. It argues that its use of plaintiff's likeness outside New York is not reached by the New York Civil Rights Law, that plaintiff cannot establish any injury from any use of his likeness in New York, and that the Court lacks jurisdiction over defendant's person. It seeks dismissal of plaintiff's prayer for an injunction on the ground of mootness.

## II.

### A. *Personal Jurisdiction*

Plaintiff moves for summary judgment dismissing the affirmative defenses, one of which is that the Court lacks personal jurisdiction over the defendant. Ultimately, of course, the burden of pleading and proving facts justifying the exercise of personal jurisdiction over the defendant lies with the plaintiff.[9] In order to prevail on the motion to dismiss the defense at this stage of the proceeding, moreover, plaintiff must show that there is "no genuine issue as to any material fact on the jurisdictional question."[10] In looking to the affidavits and other materials, courts " 'must resolve all ambiguities and draw all reasonable inferences in favor of the party against whom summary judgment is sought.' "[11] In other words, resolution of the personal jurisdiction defense must await trial unless plaintiff has established on this motion that jurisdiction over defendant exists even

---

6. At least as of October 18, 2000, both productions continued to run.

7. On July 28, 1999, a cast album CD was sold to a New York resident through defendant's web site, <www.jekyll-hyde.de> and in June and August 2000, plaintiff purchased CDs at record stores in New York. PTO, at 3.

8. *See* Second Am. Answer ¶¶ 18–22.

9. *E.g., McNutt v. General Motors Acceptance Corp.*, 298 U.S. 178, 189, 56 S.Ct. 780, 80 L.Ed. 1135 (1936).

10. *Beacon Enters., Inc. v. Menzies*, 715 F.2d 757, 762 (2d Cir.1983).

11. *Id.* (quoting *Heyman v. Commerce & Indus. Ins. Co.*, 524 F.2d 1317, 1320 (2d Cir.1975)).

if any factual disputes were resolved in defendant's favor.

Plaintiff argues that he has satisfied three alternative bases for the exercise of personal jurisdiction in this case under New York's long-arm statute,[12] Section 302 of New York's Civil Practice Law and Rules ("CPLR"). He asserts that defendant has transacted business in New York and that there is a direct relationship between that conduct and his cause of action.[13] He contends that his claim arises out of defendant's commission of a tortious act within the state.[14] In any case, he argues that defendant committed a tortious act outside the state that caused injury to the plaintiff within the state and that defendant either "regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered, in the state," or "expects or should reasonably expect the act to have consequences in the state and derives substantial revenue from interstate or international commerce."[15] As the Court concludes that this action arises out of defendant's transaction of business in New York, however, it is unnecessary to address plaintiff's other jurisdictional arguments.

*1. "Transacts Business"*

■ The Second Circuit not long ago summarized the criteria relevant to determining whether a defendant has transact-

ed business in New York within the meaning of CPLR § 302(a), subd. 1:

"The question of whether an out-of-state defendant transacts business in New York is determined by considering a variety of factors, including: (i) whether the defendant has an on-going contractual relationship with a New York corporation ...; (ii) whether the contract was negotiated or executed in New York ... and whether, after executing a contract with a New York business, the defendant has visited New York for the purpose of meeting with parties to the contract regarding the relationship ...; (iii) what the choice-of-law clause is in any such contract ...; and (iv) whether the contract requires franchisees to send notices and payments into the forum state or subjects them to supervision by the corporation in the forum state .... Although all are relevant, no one factor is dispositive. Other factors may also be considered, and the ultimate determination is based on the totality of the circumstances."[16]

Here, defendant negotiated licensing and supplemental production agreements for foreign production of *Jekyll & Hyde* in New York with MTI, WPI and SSMI (collectively the "Licensors").[17] It pays royalties to these New York parties.[18] It is subject to the Licensors' supervision in that the supplemental production contract appointed an artistic consultant to exercise all of the Licensors' approvals and to trav-

---

**12.** In a diversity case, personal jurisdiction is determined by the law of the jurisdiction in which the federal court sits. *See, e.g., Bensusan Rest. Corp. v. King*, 126 F.3d 25, 27 (2d Cir.1997).

**13.** N.Y. C.P.L.R. § 302(a), subd. 1 (McKinney 1990 & Supp.2001).

**14.** *Id.* § 302(a), subd. 2.

**15.** *Id.* § 302(a), subd. 3(i), (ii).

**16.** *Agency Rent A Car Sys., Inc. v. Grand Rent A Car Corp.*, 98 F.3d 25, 29 (2d Cir.1996).

**17.** *E.g.*, Defendant's memorandum in support of summary judgment etc., at 12; Buecheler Decl. ¶¶ 8–9.

**18.** *See* PX O, supplemental production agreement (requiring payment to MTI at its address in New York).

el to Bremen as necessary. Although the original contract called for the application of California law, the supplemental production agreement elected New York law and stated that the parties submitted to the jurisdiction of the State of New York. Moreover, the location of contract negotiations in New York was not fortuitous. As a practical matter, the musical's successful Broadway performance certainly affected the desirability to defendant of the license as well as the fact that it obtained the license in New York. In all the circumstances, there is little doubt that defendant transacted business in New York.

### 2. "Arising out of" Business Transacted in New York

■ The fact that defendant transacted business in New York is not the end of the inquiry, as the statute permits the exercise of personal jurisdiction here on the basis of such activity only if the claim arose out of that transaction of business.[19] Thus, the question remains whether plaintiff's claim is sufficiently related to defendant's transaction of business with the Licensors to warrant the exercise of specific jurisdiction over this claim.

As many courts have pointed out, determining whether a claim stands in sufficient proximity to the transaction of business in the forum state to permit the forum to exercise jurisdiction over the defendant with respect to the claim is not an exact science. It involves a judgment as to whether the cause of action is " 'sufficiently related to the business transacted that it would not be unfair to deem it to arise out of the transacted business.' " [20] "To determine whether a sufficient nexus exists, a court must evaluate the 'totality of the circumstances surrounding defendants' activities in New York in connection with the matter giving rise to the lawsuit." ' [21]

There unquestionably is a connection between the production and license agreements and plaintiff's claim. The gravamen of the claim is plaintiff's contention that defendant used his likeness without consent. But the defendant rejoins that its use was appropriate because plaintiff's contracts with the New York producers permitted use of his likeness, and defendant acquired that right by virtue of its license to produce the German version of the show.[22] Thus, while this case is unusual in that the plaintiff was not a party to the licensing and production agreements that defendant negotiated in New York—in other words, defendant did not transact business in New York *with plaintiff*—the statute does not so require. Consideration of the totality of the circumstances leads to the conclusion that there is a sufficient relationship between plaintiff's claim and the business defendant transacted in New York so that there is no unfairness to subjecting defendant to suit here on this claim.[23]

**19.** N.Y. C.P.L.R. § 302(a), subd. 1.

**20.** *PDK Labs, Inc. v. Friedlander*, 103 F.3d 1105, 1109 (2d Cir.1997) (quoting *Hoffritz for Cutlery, Inc. v. Amajac, Ltd.*, 763 F.2d 55, 59 (2d Cir.1985)).

**21.** *Id.* (quoting *Hoffritz*, 763 F.2d at 60); *see also Agency Rent A Car Sys.*, 98 F.3d at 31 (requiring a "substantial nexus" between the business transacted and plaintiff's cause of action).

**22.** Second Am. Answer ¶ 12; Buecheler Decl. ¶ 14.

**23.** *See Ligi v. Regnery Gateway, Inc.*, 689 F.Supp. 159, 163 (E.D.N.Y.1988) (claim for breach of contract granting rights for foreign language serialization arose out of transaction of business in New York principally because the out-of-state publisher entered into contract with New York company for trade distribution of English language publication which, in turn, led the plaintiff to seek the grant of foreign language serialization rights).

### 3. Due Process

The New York long arm statute, CPLR § 302, does not extend to the full limits permitted by the Due Process Clause of the Fourteenth Amendment.[24] Nevertheless, it is relevant to note in passing that defendant's negotiation of the license and production agreements in New York and its sale of at least one CD into New York from its web site created a "relationship among the defendant, the forum, and the litigation"[25] sufficient to justify the exercise of personal jurisdiction here.

᙭ ᙭ ᙭ ᙭ ᙭ ᙭

For the reasons set forth above, plaintiff has shown that there is no genuine issue as to any material fact and that it is entitled to judgment as a matter of law on the jurisdictional issue. Accordingly, insofar as plaintiff seeks summary judgment dismissing the defense of lack of personal jurisdiction, the motion is granted.

### B. Statute of Limitations

Plaintiff moves also for summary judgment dismissing the statute of limitations defense. As the statute of limitations is an affirmative defense on which the defendant bears the burden of proof at trial, the allocation of the burden of going forward on a motion for summary judgment is different than on the issue of personal jurisdiction. The plaintiff, as he has done here, "may satisfy its Rule 56 burden by showing 'that there is an absence of evidence to support [an essential element of] the [nonmoving party's] case.'"[26] At that point the burden shifts to the defendant to establish either that the claim is untimely as a matter of law or that there is a genuine issue of fact material to the limitations defense in order to preserve the defense for trial.

Plaintiff concedes that the statute of limitations on Section 51 claims is one year[27] and that this action was commenced two years after defendant began to produce merchandise bearing the allegedly offending logo. He nevertheless argues that defendant's actions have been of a continuing nature and that the statute first began to run from the most recent abuse,[28] thus saving the entirety of his claim. The argument is without merit.

Under New York law, a statute of limitations begins to run when a claim accrues.[29] A tort claim accrues upon the occurrence of the last event necessary to give rise to a claim, generally at the time

---

24. *E.g., Beacon Enters. Inc. v. Menzies*, 715 F.2d 757, 764 (2d Cir.1983) (citing *Longines–Wittnauer Watch Co. v. Barnes & Reinecke, Inc.*, 15 N.Y.2d 443, 459–60, 261 N.Y.S.2d 8, 20–21, 209 N.E.2d 68, *cert. denied*, 382 U.S. 905, 86 S.Ct. 241, 15 L.Ed.2d 158 (1965)).

25. *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 775, 104 S.Ct. 1473, 79 L.Ed.2d 790 (1984) (quoting *Shaffer v. Heitner*, 433 U.S. 186, 204, 97 S.Ct. 2569, 53 L.Ed.2d 683 (1977)); *Metropolitan Life Ins. Co. v. Robertson–Ceco Corp.*, 84 F.3d 560, 567 (2d Cir.), *cert. denied*, 519 U.S. 1006, 117 S.Ct. 508, 136 L.Ed.2d 398 (1996).

26. *Federal Deposit Ins. Corp. v. Giammettei*, 34 F.3d 51, 54 (2d Cir.1994) (quoting *DiCola v. SwissRe Holding (North America), Inc.*, 996 F.2d 30, 31 (2d Cir.1993)) (quoting in turn *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)) (brackets in original); *Frankel v. ICD Holdings*, 930 F.Supp. 54, 65 (S.D.N.Y.1996).

27. *See* N.Y. C.P.L.R. § 215, subd. 3 (McKinney 1990).

28. *See* Plaintiff's memorandum of law in support of summary judgment, at 20.

29. *E.g., Britt v. Legal Aid Soc'y*, 95 N.Y.2d 443, 446, 718 N.Y.S.2d 264, 266, 741 N.E.2d 109 (2000).

of injury.[30] In defamation and invasion of privacy cases, this almost invariably occurs at first publication—generally interpreted as when the publication first goes on sale to the public .[31] And the New York Court of Appeals, in adopting the single publication rule, long ago rejected the proposition advanced by plaintiff, viz. that each subsequent publication or distribution of challenged material sets the statute running anew.[32] Indeed, any other view could produce a "vast multiplicity of suits which could arise from mass publications ... and the attendant problem[ ] of ... endless tolling of the statute of limitations." [33]

In view of these principles, plaintiff's concession that it did not sue until more than one year after the defendant's first use of the logo would appear to be fatal to his claim. But the matter is not quite so simple for two reasons.

First, each new edition of a work—such as a paperback edition of a work previously published only in hard cover—ordinarily is viewed as "a new publication upon which a separate cause of action may be based and for which the statute of limitations begins to run again." [34] The same principle applies to merchandise bearing names or images allegedly violative of Section 51. As Judge Keenan held in *Rostropovich*,[35] the statute of limitations runs separately as to each new product distributed with a

name or image, the use of which contravenes the statute. Hence, the statute began to run as to the CD of the German cast recording on the date that it first was placed on sale in violation of Section 51, and it began to run as to each other item of merchandise on the analogous date for each.

The second difficulty is implicit in what has been said already and is intertwined with defendant's principal argument—that plaintiff has no claim for the allegedly unconsented to use of his likeness outside the State of New York. As the statute of limitations begins to run upon the occurrence of the last event necessary to give rise to a claim, the date of first publication or distribution of a given article of merchandise triggers the statute only if that publication or distribution is actionable. Hence, if Section 51 gives rise to a claim only for use of plaintiff's likeness *in the State of New York*, then the last event necessary to give rise to a claim occurs—and the statute begins to run—only upon first publication or distribution in New York. Accordingly, the Court turns to that question.

## C. Effect of Section 51 With Respect to Out–of–State Uses

 Defendant seeks dismissal of so much of plaintiff's claim as relates to out-

---

30. *E.g., Global Fin. Corp. v. Triarc Corp.*, 93 N.Y.2d 525, 529, 693 N.Y.S.2d 479, 481, 715 N.E.2d 482 (1999); *Martin v. Dierck Equip. Corp.*, 43 N.Y.2d 583, 591, 403 N.Y.S.2d 185, 189, 374 N.E.2d 97 (1978).

31. *E.g., Gregoire v. G.P. Putnam's Sons*, 298 N.Y. 119, 125–26, 81 N.E.2d 45 (1948) (single publication rule in defamation); *Rostropovich v. Koch*, No. 94–2674(JFK), 1995 WL 104123, *7 (S.D.N.Y. Mar.7, 1995) (single publication rule applicable to § 51 claims); *Khaury v. Playboy Pubs., Inc.*, 430 F.Supp. 1342, 1344 (S.D.N.Y.1977) (same); 1 ROBERT D. SACK, SACK ON DEFAMATION § 12.3.4.2, at 12–23 to 12–24

(3d ed.2000) (single publication rule application in invasion of privacy cases).

32. *Gregoire*, 298 N.Y. at 125–26, 81 N.E.2d 45.

33. *Khaury*, 430 F.Supp. at 1345.

34. 1 SACK § 7.2, at 7–4 to 7–5 (citing, e.g., *Rinaldi v. Viking Penguin*, 101 Misc.2d 928, 933, 422 N.Y.S.2d 552, 556 (1979), *aff'd as modified*, 73 A.D.2d 43, 425 N.Y.S.2d 101 (1st Dept.1980), *aff'd*, 52 N.Y.2d 422, 438 N.Y.S.2d 496, 420 N.E.2d 377 (1981)).

35. 1995 WL 104123.

of-state uses of his likeness on the ground that Section 51 of the Civil Rights Law creates a cause of action in favor only of "[a]ny person whose name, portrait, picture, or voice is used *within this state* for advertising purposes or for the purposes of trade" without written consent as required by Section 50.[36] Plaintiff disputes this conclusion, contending that the single publication rule permits a plaintiff injured in the manner claim here to bring a single action and to recover therein damages for all injuries sustained, wherever the publication occurred. But plaintiff misses the point.

To be sure, the single publication rule usually is summarized as standing for the propositions that a plaintiff, as to any single publication, may bring only one action and may recover in that action "all damages suffered in all jurisdictions."[37] But this summary does not do away with choice of law analysis. Plaintiff brought this action in a federal court in New York, thereby submitting himself to application of New York choice of law rules.[38] New York applies its own substantive law to claims for violation of the right of publicity brought by New York domiciliaries[39] such as plaintiff.[40]

The inquiry does not end there. For application of New York law to comport with due process New York must have "a significant contact or significant aggregation of contacts" with the parties and transaction "creating state interests, such that choice of its law is neither arbitrary nor fundamentally unfair."[41] Choice of New York law meets this standard. Plaintiff is a New York domiciliary, and the dispute arises from contracts that both plaintiff and defendant negotiated in New York. At least one of those contracts contains a New York choice-of-law provision. Defendant's agreements provide for ongoing contacts between the defendant and New York. Moreover, just as New York, in its role as "financial capital of the world, serving as an international clearinghouse and market place for a plethora of international transactions,"[42] has an interest in resolving financial disputes related to it, New York has an interest in resolving disputes involving subsidiary rights to Broadway theater productions.

■ Having concluded that New York substantive law controls this dispute, the Court proceeds to its determination. In *Roberson v. Rochester Folding Box Co.*,[43] the New York Court of Appeals broadly

---

36. N.Y. Civ. Rights Law § 51 (McKinney Supp. 2001) (emphasis added).

37. Restatement (Second) Of Torts § 577A(4) (1977).

38. *See Klaxon v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941) (federal court sitting in diversity applies forum state choice of law rule in selecting applicable substantive law).

39. *Rogers v. Grimaldi*, 875 F.2d 994, 1001 (2d Cir.1989) (the substantive law of the plaintiff's domicile applies to right of publicity claims); *Southeast Bank, N.A. v. Lawrence*, 66 N.Y.2d 910, 912, 498 N.Y.S.2d 775, 776, 489 N.E.2d 744 (1985) (same); *Nelson v. Working Class, Inc.*, No. 99–8854(HB), 2000 WL 420554, at

*2 (S.D.N.Y. Apr.18, 2000); *Rostropovich v. Koch*, No. 94–2674(JFK), 1995 WL 104123, at *8 (S.D.N.Y. Mar.7, 1995).

40. *See Am. Cpt. ¶ 4.

41. *Allstate Ins. Co. v. Hague*, 449 U.S. 302, 312, 101 S.Ct. 633, 66 L.Ed.2d 521 (1981) (plurality); Lea Brilmayer, Conflict Of Laws 140 (1995).

42. *Zeevi v. Grindlays Bank (Uganda) Ltd.*, 37 N.Y.2d 220, 227, 371 N.Y.S.2d 892, 898, 333 N.E.2d 168, *cert. denied*, 423 U.S. 866, 96 S.Ct. 126, 46 L.Ed.2d 95 (1975); *see also First Union Nat. Bank v. Paribas*, 135 F.Supp.2d 443, 452 (S.D.N.Y.2001).

43. 171 N.Y. 538, 64 N.E. 442 (1902).

declared that there is no common law right of privacy in the State of New York and denied recovery to an infant plaintiff whose photograph had been distributed widely by the defendant in order to advertise its baking flour. The Legislature promptly adopted the statute here in question to overturn the holding of *Roberson*, albeit not its broad dictum, by creating a cause of action for the commercial or trade use of one's name or picture without one's consent.[44] In doing so, however, it created a claim in favor only of one whose likeness had been used for prohibited purposes "within this state." In consequence, as New York courts uniformly have held, the substantive law of New York is that one may recover for trade or commercial use of one's likeness only to the extent that the use occurs in New York.[45]

■ This conclusion has two implications here. The first is that out-of-state uses of plaintiff's likeness for trade or advertising purposes are not actionable under New York law. To the extent that plaintiff seeks damages based on such uses, his claim must be dismissed. Second, as the out-of-state uses are not actionable, they cannot trigger the running of the statute of limitations. Accordingly, the statute of limitations as to each type of merchandise on which plaintiff's likeness has appeared runs from the date on which it first was offered for sale in New York.

■ The merchandise that indisputably was sold by defendant in New York was the one CD purchased in July 1999 from defendant's web site. As that sale occurred less than one year before the commencement of this action, the claim with respect to that sale is timely unless the offering of the German language cast recordings via the Internet web site accessible from New York (a) began more than one year before the commencement of this action, and (b) was sufficient to trigger the running of the statute of limitations—in other words, was a use "within this state."

New York courts do not seem to have addressed the question whether items on a web site that can be viewed in New York are published or offered for sale to the public in New York.[46] Perhaps the most useful analogy is to jurisdictional analysis of commercial torts such as trademark infringement because such a tort is committed within New York if infringing goods

---

**44.** Despite some indications that the New York Court of Appeals would retreat from *Roberson* and recognize a common law right of privacy, *see Galella v. Onassis*, 353 F.Supp. 196, 227–30 (S.D.N.Y.1972), *mod. on other grounds*, 487 F.2d 986 (2d Cir.1973), it steadfastly has declined to do so. *E.g., Howell v. New York Post Co.*, 81 N.Y.2d 115, 123, 596 N.Y.S.2d 350, 354, 612 N.E.2d 699 (1993).

**45.** *E.g., Reilly v. Rapperswill, Corp.*, 50 A.D.2d 342, 377 N.Y.S.2d 488, 492 (1st Dept.1975) (limiting injunction against violation of right of publicity to activities in New York); *Rosemont Enters. v. Urban Sys.*, 42 A.D.2d 544, 544, 345 N.Y.S.2d 17, 18 (1st Dept.1973) (same); *Shamsky v. Garan, Inc.*, 167 Misc.2d 149, 159–60, 632 N.Y.S.2d 930, 936 (Sup.Ct. N.Y.1995); *Simeonov v. Tiegs*, 159 Misc.2d 54, 60, 602 N.Y.S.2d 1014, 1018 (N.Y.C.Civ. 1993); *see also Pierrottie v. Dell Publ'ns Co.*,

199 F.Supp. 686, 688 (S.D.N.Y.1961) (stating that under § 51 "the injuries for which damages are sought must be shown to be causally related to the use of [plaintiff's] photograph within this state").

**46.** New York courts have considered some § 51 cases involving the Internet, but this precise question has not been raised. *E.g., Leary v. Punzi*, 179 Misc.2d 1025, 687 N.Y.S.2d 551 (Sup.Ct. Suffolk 1999) (holding that use of image on dance center's web site created in New York was not for "advertising purposes"). *But see Firth v. State of New York*, 184 Misc.2d 105, 706 N.Y.S.2d 835 (N.Y.Ct.Cl.2000) (applying the single publication rule to an Internet defamation and holding that the statute of limitations ran from when the report at issue first was made available on the Internet).

have been offered for sale in New York.[47] There is consensus in the developing case law that whether a defendant has committed a tort in the state through its web site depends on how interactive the web site is.

In *Bensusan Restaurant Corp. v. King*, a New York club sued a Missouri jazz club of the same name, basing jurisdiction on defendant's web site, which contained the infringing name and a hyperlink to the New York club. The Second Circuit affirmed the district court's holding that defendant committed a tort where the web site was created rather than where it was viewed.[48]

Courts have reached different conclusions when faced with more interactive web sites that offer chatting, ordering, or downloading of forms or when e-mail that contains the disputed image is sent into the state.[49]

These cases suggest the appropriate result here. Defendant's web site was created and maintained in Germany in connection with the Bremen production of the show. The CD in question was of a German language cast recording, certainly an item of limited appeal in the United States. The web site itself was in German. The only suggestion that the merchandise, the web site, or the Bremen production was promoted in New York or, for that matter, elsewhere in the United States is plaintiff's unsupported assertion that there was a hyperlink from the New York production's web site to defendant's web site.[50] Although such a hyperlink might be a factor suggesting an offer for sale in New York, plaintiff here alleges only that defendant's web site was "accessible" through that hyperlink, not that defendant was responsible for the connection. In these circumstances, the Court holds that the offering of merchandise containing the plaintiff's image on the German web site did not constitute a use of the image "within this state." [51] Accordingly, it neither began the running of the statute of limitations nor gave rise to a broader cause of action.

## III

■ For the foregoing reasons, plaintiff's motion for summary judgment dismissing the affirmative defenses is granted to the extent that the defense of lack of personal jurisdiction is dismissed. The defenses of lack of subject matter jurisdiction and *forum non conveniens*, which lack substantial basis, also are dismissed.[52]

---

**47.** *E.g., Dave Guardala Mouthpieces, Inc. v. Sugal Mouthpieces, Inc.*, 779 F.Supp. 335, 337 (S.D.N.Y.1991) (quoting *German Educ. Television Network, Ltd. v. Oregon Pub. Broad. Co.*, 569 F.Supp. 1529, 1532 (S.D.N.Y.1983)).

**48.** 126 F.3d 25, 29 (2d Cir.1997).

**49.** *E.g., Citigroup Inc. v. City Holding Co.*, 97 F.Supp.2d 549, 567 (S.D.N.Y.2000); *Zippo Mfg. Co. v. Zippo Dot Com, Inc.*, 952 F.Supp. 1119, 1127 (E.D.Pa.1997).

**50.** *See* Plaintiff's memorandum of law in support of summary judgment, at 4.

**51.** *Cf. Stewart v. Vista Point Verlag & Ringier Publ'g*, No. 99–4225(LAP), 2000 WL 1459839, at *4–*5 (S.D.N.Y.2000) (German-language web site does not target New York residents).

**52.** Defendant's contention that the action should be dismissed for lack of the requisite amount in controversy is meritless, as the Court cannot determine to a legal certainty that plaintiff could not recover more than $75,000. *E.g., Whitney Holdings, Ltd. v. Givotovsky*, 988 F.Supp. 732, 736 (S.D.N.Y.1997) (citing cases). So too is its *forum non conveniens* defense. While the Court assumes that Germany is an adequate alternative forum, the combination of the deference due the choice of forum by the plaintiff, a New York domiciliary, and the importance of New York sources of evidence concerning the meaning of the pivotal agreements between plaintiff and the Licensors, on the one hand, and the Licensors and defendant, on the other, has made it impossible for defendant to prevail on its contention. *See, e.g., Gulf Oil Corp. v.*

Plaintiff's motion is denied in all other respects. Defendant's cross-motion for summary judgment dismissing the complaint is granted to the extent that the action, insofar as it seeks damages for allegedly unconsented to uses of plaintiff's likeness outside the State of New York, is granted. It is denied in all other respects.

SO ORDERED.

*Gilbert,* 330 U.S. 501, 508–09, 67 S.Ct. 839, 91 L.Ed. 1055 (1947); *Pavlov v. Bank of New York Co.,* 135 F.Supp.2d 426 (S.D.N.Y.2001).